389 So.2d 457 (1980)
Raymond KLUMPP, Plaintiff-Appellee,
v.
COLONIAL PIPELINE COMPANY et al., Defendants-Appellants.
No. 7622.
Court of Appeal of Louisiana, Third Circuit.
September 24, 1980.
*460 Sanders, Downing, Kean & Cazedessus, Leonard L. Kilgore, III, Baton Rouge, for defendants-appellants.
Young & Burson, I. J. Burson, Eunice, for plaintiff-appellee.
Before CULPEPPER, SWIFT and STOKER, JJ.
STOKER, Judge.
This is a suit by certain landowners against the owner of a pipeline servitude and its independent contractor. Plaintiffs seek damages against Colonial Pipeline Company (Colonial) and its independent contractor, Ford, Bacon & Davis Construction Corporation (FB&D). Colonial owned a servitude across plaintiffs' land[1] and entered into a contract for the laying of an additional pipeline within the servitude. Plaintiffs claim defendants damaged them in numerous respects in the course of doing the work authorized by the contract. The plaintiffs are several in number but are represented in this suit by Raymond Klumpp as their agent and attorney-in-fact.[2] Raymond Klumpp is a plaintiff individually in his own right. In this opinion we will refer to the plaintiffs in the plural.

ISSUES
In addition to the merits this case presents two preliminary issues. The first preliminary issue is whether or not the district court for the Parish of Acadia where the case was tried was a court of proper venue. The district court held that it was, and we affirm that holding. The second preliminary issue is an alternative defense asserted in the event venue is found in Acadia Parish. That issue is whether plaintiffs waived their contract action by asserting an action in tort in a supplemental and amending petition. We hold there was no waiver. The final issue concerns the merits of the case.
When the district court overruled Colonial's exception of venue, Colonial applied to this Court of Appeal for a writ of certiorari. The writ was denied.[3] The case was then tried in Acadia Parish. The trial court decided in favor of plaintiffs against Colonial and FB&D. Colonial has appealed, but FB&D has not appealed.

EXCEPTION OF VENUE
Plaintiff's original petition alleges many violations of the servitude contract which they assert resulted in damages. As the petition was originally drafted, petitioners seem quite clearly to have had a contract action in mind. The relief demanded was in part for specific performance and in part for damages. Colonial and FB&D both filed declinatory exceptions of improper venue. Treating the suit as one in contract, Colonial alleged that the district court in Acadia was not a court of proper venue under LSA-C.C.P. art. 42(4). Colonial alleged it was a Delaware corporation authorized to do business in Louisiana and had its principal business establishment in Louisiana in Orleans Parish as designated in its application to do business. FB&D, also a Delaware Corporation, alleged the same *461 reasons in its exception and alleged its principal business establishment was in Ouachita Parish.
Upon the filing of these exceptions plaintiffs, through their agent, Raymond Klumpp, filed an amended and supplemental petition characterizing the actions of both defendants as offenses under LSA-C.C. art. 2315. They also allege defendants violated duties owed under LSA-C.C. arts. 771 and 774. Plaintiffs alleged that under the circumstances the district court in Acadia Parish had venue under LSA-C.C.P. art. 74 and that in the case of conflict between venue articles, LSA-C.C.P. art. 45 granted plaintiffs the option of bringing the action in any venue provided by the Code of Civil Procedure. Plaintiffs alleged in the supplemental and amending petition that the land damaged was located in Acadia Parish and therefore that parish was the most convenient forum for the witnesses.
Under the general rules of venue provided for in LSA-C.C.P. art. 42(4) a contract action against Colonial could be brought in Orleans Parish only and likewise such an action against FB&D would have to be brought in Ouachita. This rule flows from the general principle embodied in Article 42 of the Code of Civil Procedure that a defendant must be sued at his domicile. The Code of Civil Procedure provides exceptions to this rule, and one of these is contained in LSA-C.C.P. art. 74 which provides as follows:
"An action for the recovery of damages for an offense or quasi offense may be brought in the parish where the wrongful conduct occurred, or in the parish where the damages were sustained. * * *"
Colonial argues on appeal that the trial court committed error in overruling the exception of venue. It urges that, despite the amendment of the petition, the action is nothing more than a breach of contract action. It forcefully argues that the acts complained of, if true, are breaches of the contract and the action should be tried in Orleans Parish. Appellant's arguments have much merit and numerous decided cases are cited as authority for appellant's position as exceptor. Moreover, Colonial points out the well established rule that a principal is not responsible for the negligence of its independent contractor and notes that Colonial contracted out all operations to FB&D.
After considering all aspects of the venue question, we have concluded that the trial court did not commit error in overruling the exceptions of venue. The better authority, we think, tends toward a liberal application of the rule of venue. In this case the situs of the land allegedly damaged is Acadia Parish, and if the positions on venue of Colonial and FB&D had been accepted, plaintiffs would have been put to expense and inconvenience of pursuing two separate suits in two separate courts. Hence, the equities are in favor of maintaining venue in Acadia Parish.
It is our impression of plaintiffs' case that they have alleged both a cause of action in contract and a cause of action in tort against Colonial. Under the circumstances plaintiffs had a choice of venues under Smith v. Baton Rouge Bank & Trust Company, 286 So.2d 394 (La.App. 4th Cir. 1973) and the authorities cited in that opinion. See also, Albritton v. McDonald, 363 So.2d 925 (La.App. 2nd Cir. 1978), writ denied 366 So.2d 561 (La.1979).
Without dwelling on each alleged item of damage, or each alleged act by which Colonial and FB&D allegedly damaged plaintiffs' land, we cite one allegation we consider quite persuasive. Paragraph XIX of the supplemental and amending petition sets forth the following:
"Defendant's tortious misconduct has caused plaintiff damage in loss of fertility and proper drainage of land outside of the right-of-way resulting in damages of $200,000.00 in loss of income from 1977 crops and the crops to be planted in future years, and in cost of restoration of said land."
In alleging that the tortious conduct caused loss of fertility and proper drainage outside the right-of-way resulting in a money loss in restoration costs and in loss *462 of crops to be planted in future years, we feel plaintiffs have alleged damages not strictly resulting from breach of contract. While it is true that Colonial would not ordinarily be liable for the tortious conduct of its independent contractor, we do not believe Colonial as principal can escape if the damage results from the independent contractor doing exactly what it contracted to do for Colonial. This would apply to Colonial at least insofar as the work performed by FB&D interfered with proper drainage across the right-of-way and depositing excess spoil resulting from the operation of boring under the Mamou Canal and State Highway 97. Therefore, the petition sets forth allegations of tortious conduct on the part of Colonial. In Smith v. Baton Rouge Bank & Trust Company, supra, the court said:
"We believe economy of judicial administration opposes dual (or multiple) trials of the same factual circumstances where one trial should serve to determine both (a) whether the execution of the earlier judgment should be enjoined (as extinguished by `overall sales') and (b) whether defendant owes plaintiff an accounting for `unjust enrichment' resulting from `overall sales'.
* * * * * *
"We conclude that where venue is proper as to one claim, the disposition of which will necessarily affect a related second claim as to which venue might otherwise be improper, the court has the authority to decide both claims in the interest of efficient judicial administration, and therefore should overrule an exception to the venue."
In support of its exception of venue, Colonial relies principally on the case of Clement v. Redi-Bilt Corporation, 249 So.2d 607 (La.App. 4th Cir. 1971). There defendant undertook as contractor to construct a building for the plaintiff. The suit was for damages resulting from alleged unsatisfactory workmanship performed by defendant for the plaintiff. Here, Colonial was not performing work for the Klumpps. Their contract was an agreement granting an additional servitude which set forth conditions under which the servitude was to be used including construction operations for the additional pipeline. In addition to a breach of certain servitude contract conditions, the Klumpps allege that their land has been damaged in the course of the work caused to be done on the land through FB&D. Clement v. Redi-Bilt Corporation, supra, is distinguishable from Smith v. Baton Rouge Bank & Trust Company, supra, and Albritton v. McDonald, supra.

ELECTION OF REMEDIES
Following the portion of appellant's brief devoted to the venue question, appellant sets forth a defense of election of remedies. Appellant articulates the defense as follows:
"It is of some significance that while the plaintiff's supplemental and amending petition alleges negligence, it specifically reiterates all of the prayer of the original petition. The prayer asks for both specific performance of certain provisions of the contract originally sued upon and for an award of damages stipulated in the contract. Rather than attempting to elect between a suit in contract or one in tort, the plaintiff apparently sought the best of both, that is, the venue of a tort action and the stipulated damages and attorney's fees permitted in contract action. If allowed, the result would be not only patently unfair, but unauthorized by law.
"In electing to proceed in the venue permissable (sic) under [Louisiana Code of Civil Procedure] article 74, the plaintiff has elected to proceed in tort against the defendants and has thereby waived any contractual remedies which he possessed. See, La.C.C.P. art. 462;[4] See also, Aetna *463 Life and Casualty Company v. Dotson, [346 So.2d 762 (La.App. 1st Cir., 1977)]; Schouest v. Texas Crude Oil Company, 141 So.2d 155 (La.App. 1st Cir., 1962)."
Appellant's claim that plaintiffs have waived any claims for breach of contract by filing allegations of injury through tortious conduct is not sound. There has been no election of remedies. Aetna Life and Casualty Company v. Dotson, supra, includes the statement: "Our jurisprudence has evidently established that if the plaintiff chooses to seek recovery under one remedy, he, in effect, waives his cause of action for the other." Schouest v. Texas Crude Oil Company, supra, is cited as authority for this statement.
Without considering the validity of the election of remedies principle, we do not find any election in plaintiffs' petition as supplemented and amended. Moreover, we do not read the case of Aetna Life and Casualty Company v. Dotson, supra, as lending support to the doctrine. Its holding was in fact not based on that doctrine. In that case the plaintiff rather than the defendant invoked the doctrine. In Dotson the defendant allegedly embezzled money from her employer by fraudulent means. Aetna Life and Casualty Company was the insurer of the employer for money losses sustained by the employer caused by fraud or infidelity of its employees. After paying the employer, Aetna brought a subrogation suit against Dotson. Dotson claimed that the action was a tort action and had prescribed as the suit had not been brought within the one year period applicable to tort actions. The trial court sustained an exception of prescription filed by Dotson. Aetna as plaintiff appealed. As appellant Aetna ingenuously argued that Dotson's alleged fraudulent schemes gave rise to concurrent causes of action, one delictual, the other quasi-contractual. Aetna sought to avoid the one-year prescription by claiming to have elected to assert the quasi-contractual action and to have waived the delictual action by setting forth in its petition a cause of action arising under quasi-contract, thereby making the ten year prescription period of LSA-C.C. art. 3544 applicable.
On appeal the appellate court affirmed the trial court. It did so on the simple ground that the subrogation petition of Aetna, no matter how artfully drawn in an attempt to make it appear as quasi-contract action, was not such an action, but was a tort action. Therefore, the ruling was not pitched on an Election of remedies.
Even if the quotation from Aetna Life and Casualty Company v. Dotson purporting to set forth the waiver theory under the doctrine of election of remedies correctly represents the law of this State, the doctrine still has no application in the case before us. In Aetna's defense to Dotson's exception of prescription, Aetna attempted to establish that only one action had been asserted and the other was therefore waived. In that case the appellate court "conceded that facts forming the basis of a cause of action may afford a plaintiff concurrent remedies." However, it was found that only one action was asserted. In fact Aetna's contention was based on the assertion that only one action, a quasi-contractual action, had been asserted as a predicate to the further assertion that action had waived the tort action. The trial and appellate courts held the facts did not allege a quasi-contractual action. Hence, concurrent remedies were not in fact urged.
In the case before us the Klumpps have not abandoned their contract action set forth in the original petition. They assert both actions in contract and in tort. There has been no election.
We have examined the case of Schouest v. Texas Crude Oil Company, supra. We find it to be similar to the Dotson case in that the plaintiff attempted to couch a tort claim in terms of quasi-contract to avoid *464 the prescription. In Schouest the defendant dredged a canal across plaintiff's land without authority. The trial court and the appellate court examined the petition and found that the essence of the allegations described a tort action and not a quasi-contract action. Moreover, we do not find in the case any statement, such as appears in Aetna Life and Casualty Company v. Dotson, supra, to the effect that where there are concurrent remedies bringing suit under one theory waives the other.
Appellant also relies on LSA-C.C.P. art. 462. We do not find that the Klumpps' petition as supplemented and amended is in contravention of the article.
It would appear to us that a proper construction of Article 462 of the Code of Civil Procedure in this context is embodied in the following pronouncements from Albritton v. McDonald, supra.
In Smith v. Baton Rouge Bank & Trust Co., 286 So.2d 394 (La.App. 4th Cir. 1973), plaintiffs alleged certain facts and prayed for an injunction against execution of a judgment rendered in favor of the bank by the Orleans court and for a money judgment against the bank because the bank was unjustly enriched by the transaction between itself and plaintiff. The bank filed an exception of improper venue, contending it should have been sued at its parish domicile. The Orleans court had venue as to the injunctive relief but presumably would not have had venue as to the unjust enrichment relief. The Fourth Circuit properly noted that it was not presented with an improper cumulation of unrelated actions where venue existed in one but not in the other and that its case was one in which the claim for unjust enrichment is based on the same factual allegations that serve as a basis for the injunction. 286 So.2d 396. Our situation is similar.
We agree with the holding in Smith that where a plaintiff has the right to institute an action on two or more claims arising out of one factual circumstance and that where venue is proper as to one claim, the disposition of which would affect the second claim as to which, if standing alone, venue might not be proper, the court has the venue of the action to decide both claims in the interest of efficient judicial administration, and the court therefore should overrule an exception to the venue.
Considering the mandate of C.C.P. 5051 that the rules of procedure implement substantive law and are to be liberally construed, we choose not to require a litigant in these circumstances to select a theory of his case which might deprive him of relief to which the substantive law entitles him. Comment (b), C.C.P. 862. See Castille v. Folck, 338 So.2d 328 (La. App. 3d Cir. 1976).
For the foregoing reasons we find no merit to Colonial's contention that the Klumpps have waived any claims they may have under the servitude contract because of the fact that they have chosen to assert claims in tort as well as contract against Colonial.

MERITS OF THE CASE
Prior to the events which led to the controversy in this case Colonial Pipeline Company enjoyed a fifty foot servitude or right-of-way across the lands of the estate of Armentine Aguillard Klumpp within which it could lay and conduct a pipeline. On December 4, 1975, this estate represented by Raymond Klumpp as administrator entered into an additional servitude agreement. At that time Colonial had already utilized the servitude by laying a 36-inch line located 15 feet south of the north line of the right-of-way. Apparently this right-of-way had been purchased originally in 1962.
The new agreement of December 4, 1975, did not grant any additional right-of-way, but rather granted the right to lay an additional line. This was a 40-inch line to be located 15 feet from the south boundary of the right-of-way previously given. The total servitude, or right-of-way, was to remain 50 feet in width. However, additional temporary working space was granted.
*465 Various portions of the servitude agreement of December 4, 1975, are at issue in this case.
The Klumpp property consists generally of two adjacent tracts extending easterly from the Mamou Canal and State Highway 97 which run parallel to one another. The Colonial pipeline right-of-way runs generally east and west. It is bisected at one point by a parish road running almost due north. (See Exhibit P-8). It is the contention of the plaintiffs that Colonial and FB&D damaged the Klumpp property in the laying of the additional pipeline, the 40-inch line, and that they have never completed cleaning up operations since the laying of the line. As various provisions of the December 4, 1975, right-of-way agreement granting the additional servitude figure prominently in this case, they will either be quoted or summarized.
Paragraph one of the contract reads as follows:
"1. No new right-of-way is granted by this agreement; that is, the line to be laid hereunder shall be constructed within the limits of the 50-foot right-of-way purchased by Grantee in 1962, except for the first 115 feet after crossing Mamou Canal on to Grantor's property, for which distance the right-of-way shall be 20 feet, extending 5 feet North and 15 feet South of the line to be laid under this agreement, all as shown on the Plat of Survey attached hereto and made a part hereof; provided, however, at any point where the pipeline crosses any drain ditch, canal or any like waterway, or any road or similar obstruction, Grantee shall, during the construction, be entitled to the additional temporary working space shown on the attached plat. It is also agreed that Grantee shall have the right to use a strip of land seventy (70) feet in width adjacent to the South side of said right-of-way, and running the length thereof, as temporary work space during the construction of said pipeline."
Paragraphs 6, 7, and 8 read as follows:
"6. All trenches will be backfilled after being first pumped dry and any future sinking of the ground as a result of the construction of the pipeline will be refilled and releveled at Grantee's expense upon demand by Grantor; Grantee agrees to level and return the land to its original condition as near as practical promptly after construction; Grantee further agrees to pay Grantor on a field to field basis for the resurveying, land-leveling and rebuilding rice levees on and off the right-of-way to the extent necessary to restore the land and levees to their former condition on the basis of $15.00 per acre, not to exceed, however, the sum of $2,400.00, it being understood that this clause is not to be construed as relieving Grantee of its obligation to return the land, including rice fields and levees, to its original condition as near as practical as herein provided.
"7. Any dirt removed from the subsurface as a result of boring operations under canal rights of ways, shall be hauled to a low place on Grantor's property, not to exceed one-quarter (¼) mile from the ditch line.
"8. It is understood that from the date of entry to the end of cleanup operations, the Grantee shall not remain on Grantor's property in excess of sixty (60) days, and for every day thereafter that Grantee needs to complete operations, it shall pay $200.00 stipulated damages per day to Grantor. This paragraph shall not be operative if Grantee is delayed by strike, inclement weather or other circumstances beyond the control of Grantee, but said delay shall not be extended beyond an additional sixty (60) days."
Paragraph 10 reads as follows:
"10. Grantee shall be responsible for damages off the right-of-way caused by Grantor's inability to move or remove water from lands above and/or below the right-of-way."
Paragraph 15 reads as follows:
"15. Grantee agrees that in digging the trench into which the pipeline will be laid, the top eight (8) inches of soil will be removed first by double ditching method *466 and that when the trench is backfilled after construction this eight (8) inches of soil will be used as the top cover of the trench."
Paragraph 18 reads as follows:
"18. In the event Grantee or any of its contractors shall exceed and go over the right-of-way and temporary work space granted herein, Grantee shall pay a penalty of $35.00 per rod for each lenial rod used on the right-of-way which does not exceed five (5) feet in width, thereafter the penalty shall be doubled for each additional five (5) feet in width used."
Paragraph 19 provides for the payment of court costs and attorney fees in the event it is necessary to resort to legal process and reads as follows:
"19. In the event Grantor, after prior 60-day notice in writing, should have to resort to legal process for the enforcement of any of the terms of this agreement, including damages, the Grantee shall be obligated to pay expenses incurred by Grantor, including court costs and attorney fees."
In summary, the complaints and claims of plaintiffs are as follows:
(1) Colonial and FB&D failed to complete within the sixty days the construction of the pipeline operation including cleanup operations. Therefore, under paragraph 6 of the servitude contract Colonial is liable for the amount of $200.00 per day as "liquidated damages" until the right-of-way is cleaned, which would include some dirt leveling and hauling away of certain excess dirt.
(2) Plaintiffs assert they were damaged by the failure of defendants "to haul dirt recovered from subsurface boring operations to low places on grantor's property" as contemplated by paragraph 7 of the servitude agreement.
3. The sum of $2,400.00 is claimed for land leveling at $15.00 per acre, subject to the maximum of $2,400.00 to restore the land and levees to their former condition.
4. Plaintiffs seek a writ of mandamus to compel defendants to refill and relevel all trenches to compensate for sinking of the ground and to restore the land to its original condition. In the alternative plaintiffs demand $100,000.00 for the purpose of paying a contractor to perform such work.
5. Plaintiffs claim damages for crop losses on the assertion that in 1977 crops could not be planted because of debris, unspread soil and generally ruinous conditions left by defendants.
6. Defendants failed to follow the double ditching method prescribed by paragraph 15 of the servitude contract resulting in permanent loss of fertility of the land.
7. Plaintiffs claim that the contractor, FB&D exceeded the right-of-way and the temporary work space granted to them under the servitude contract between Colonial and the Klumpps. The Klumpps claim $20,000.00 in damages for this alleged wrong.
8. Finally plaintiffs claim that pursuant to paragraph 19 of the contract defendants were given a written 60-day notice to correct the deficiencies and damage to the land and that defendants failed to respond and comply. Therefore, plaintiffs demand attorney's fees in the amount of one-third of all damages awarded plus $20,000.00.

I. DELAY DAMAGES
After trial the trial court awarded judgment in favor of the plaintiffs in several respects. It found that the defendants had failed to complete the pipeline operation, that is, had failed to complete cleaning up operations and generally had left certain things undone which required correction. In his reasons for judgment the trial court stated as follows:
"The court finds defendant, Colonial Pipeline Company to be liable to plaintiff for contractual damages as a result of defendant's failure to complete the pipeline in issue as per agreement. The contract calls for delay damages in the amount of $200.00 per day until the job is completed. Said damages are retroactive to November 17, 1976, the date written notice was sent to Colonial demanding *467 completion; and will continue to accrue until such time the entire pipeline job is completed. The court bases its decision on the following jurisprudence: Lama v. Monale, 218 La. 511, 50 So.2d 15, (La. 1951); Steward-McGhee Construction Co. v. Caddo Parish School Board, 165 La. 200, 155 So. 458 (La.1928); and Pembroke v. Gulf Oil Corporation, 454 F.2d 606 (5th Cir., 1971).
The trial court has confused the obligation of Colonial not to exceed sixty days' use of the land with customary penalty clauses in construction contracts between an owner and a builder. Such contracts usually stipulate that a per diem penalty be paid in the event a contractor fails to complete his contract within a certain time period stated in the contract. In this case no construction contract existed between the Klumpps and Colonial. The contract between them was an agreement creating an additional servitude on the Klumpp land and which gave Colonial sixty days within which to do its work. The penalty for remaining on the land beyond the sixty days required payment of $200.00 for each day the defendant remained on the land. The trial court, in our opinion, has erroneously construed this provision to require a payment of $200.00 per diem in lieu of assessing damages for failure to cleanup the right-of-way or failure to return it in the condition required by the contract. This requirement was to level and return the land to its original condition as near as practical promptly after construction.
On the issue of delay damages, counsel for defendant-appellant, Colonial, has furnished us with a well expressed statement and research of law which we adopt as our own.
"In seeking to hold Colonial liable for delay damages and other stipulated contractual penalties, the plaintiff and the Trial Court have erroneously confused the various provisions of the contract and wrenched the agreement all out of recognition from the words actually contained therein.
"The Trial Court made the following award of delay damages:
'The amount of $200.00 per day from March 17, 1976 [apparently the date of putting in default], until the defendant completes the pipeline work upon the plaintiff's property, such being delay damages.'
"The above quoted award is based upon a gross misinterpretation of paragraph 8 of the contract, which provides:
'8. It is understood that from the date of entry to the end of clean-up operations, the Grantee shall not remain on Grantor's property in excess of sixty (60) days, and for everyday thereafter that Grantee needs to complete operations, it shall pay $200.00 stipulated damages per day to Grantor. This paragraph shall not be operative if Grantee is delayed by strike, inclement weather or other circumstances beyond the control of Grantee, but said delay shall not be extended beyond an additional sixty (60) days.'
"The Trial Judge incorrectly interprets paragraph 8 to mean that:
`The agreement between plaintiff and Colonial provided for delay damages for incompletion of the pipeline within sixty (60) days allowed for said completion.' [Reasons for Judgment, Record, page 345.]
"As we have noted, the foregoing statement is simply not a correct paraphrasing of paragraph 8 which provides simply that `the Grantee (Colonial) shall not remain on Grantor's property in excess of sixty (60) days.' The interpretation given this provision by the Trial Court does not constitute the true intention of the parties or the true sense of the words of the contract.
"In connection with the rules governing interpretation of contracts we refer to the provisions of the Louisiana Civil Code. Louisiana Civil Code article 1945 provides:
`Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:

*468 `First-That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;
`Second-That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;
`Third-That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;
`Fourth-That it is the common intent of the parties-that is, the intention of all-that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract.'
Louisiana Civil Code article 1946 provides that:
`The words of a contract are to be understood, like those of a law, in the common and usual significance, without attending so much to grammatical rules, as to general and popular use.'
Louisiana Civil Code article 1948 provides that:
`When there is a doubt as to the true sense of the words of a contract, they may be explained by referring to other words or phrases used in making the same contract.'
Louisiana Civil Code article 1950 provides that:
`When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms.'
"A careful reading of the right-of-way contract and especially those paragraphs containing penalty provisions in accordance with the foregoing rules of interpretation will reveal that the interpretation given the contract by the Trial Court and the plaintiff is clearly erroneous.
"Penal Clause of Paragraph 8
"The $200.00 per day limitation contained in paragraph 8, quoted above, is clearly in the nature of a penal clause. Louisiana Civil Code article 2117 provides:
`A penal clause is a secondary obligation, entered into for the purpose of enforcing the performance of a primary obligation.' (emphasis added)
Louisiana Civil Code article 2118 provides that:
`A penal obligation necessarily supposes two distinct contracts, one to do or to give that which is the principal obligation of the contract, and the other to give or do something, if the principal object of the agreement be not carried into effect.' (emphasis added)
"Thus, a penalty clause presupposes a primary and a secondary obligation. In order to determine if a stipulated penalty is due, it is first necessary to determine what the principal object of the penalty clause was and if it was breached.
"A correct reading of paragraph 8 reveals that the principal obligation to which the penalty clause attaches is the obligation of Colonial `not to remain on Grantor's property in excess of sixty (60) days.' Only if Colonial was to remain on Grantor's property in excess of that period was the penalty to be effective.
"By an exercise of semantics, the plaintiff convinced the Trial Court to apply an entirely inapplicable primary obligation to the $200.00 per day penalty provided by paragraph 8 of the agreement. Plaintiff urged and the Trial Court accepted the interpretation that the $200.00 per day penalty applied to the obligation of Colonial contained in paragraph 6 to return the land to its original condition as near as practical.
"However, paragraph 6 contains its own penalty for the failure, if any, of Colonial to return the land as near [as] practical to its original condition. For the potential breach of this obligation, paragraph 6 stipulated a penalty of $15.00 per acre, not to exceed the sum of $2,400.00 `to the extent necessary to restore the land and levees to their former condition.'
"The principal obligation of paragraph 8 is not to restore the land to its original condition as near as practical within sixty (60) days. To the contrary, the obligation is to surrender possession of the property *469 within sixty (60) days. [Emphasis supplied] In this regard it is clear that Colonial remained on Grantor's property from August 4 to November 1, 1976, or a total of 87 days. [Testimony of Robert Hoover, Vol. 3, T-88; Testimony of Raymond Klumpp, Vol. 4, T-11.] Of the 87 days which Colonial's contractor remained on the property, the contractor was delayed by rain for nine (9) days. Therefore, Colonial remained in possession of the property eighteen (18) days beyond that period of time stipulated in paragraph 8. However, Colonial was not put into default until November 17, 1976, a full sixteen (16) days after it had surrendered possession of the right-of-way to the landowner. [Vol. 3, T-10, Exhibit P-1.]
"It is well established that a putting in default is a prerequisite to recovery under such a penal clause. Delay damages or penalty damages are only triggered by a putting in default and plaintiff is only entitled to recover demurrage or delay damages from the time that the party is put into default. Louisiana Civil Code articles 1911, 1933, 2126; Southern Construction Co. vs. Housing Authority, 251 La. 569, 197 So.2d 628 (1967); Herman Bros. vs. Troxler, 166 La. 587, 117 So. 727 (1928); Godchaux vs. Hyde, 126 La. 187, 52 So. 256 (1910); Gullotta vs. Swinney, 143 So.2d 775 (La.App. 1st Cir. 1962). In David vs. Glenn, 3 La.Ann. 444, 445 (La.App. Orl. Cir. 1848) the Court stated:
`As long as the obligee does not demand the execution of the contract, the law supposes that it is because the nonperformance does him no injury.'
"The cases cited by the Court in its Reasons for Judgment illustrates the Court's error in contract interpretation. Each of the cases cited contains a clearly identifiable primary obligation, the breach of which activated the penal clause. The case of Lama v. Manale, 218 La. 511, 50 So.2d 15 (1951), involved a lease contract with the provision that lessee was to immediately surrender possession of the premises and stipulated a penalty five times the daily rate for the failure of lessee to surrender possession. The lessee refused to leave and was evicted by judicial proceedings. The Court of Appeal applied the stipulated penalty contained in the lease from the time from termination of the lease until the actual surrender of possession. In the Lama case, as in the instant case, the primary obligation was to surrender possession of the premises within a stipulated time period. However, in the instant case, Colonial did surrender possession of the premises prior to a putting in default. It is interesting to note that the Court intimated that the clause would not have been enforceable if it led to absurd consequences.
"In Stewart-McGhee Construction Co. vs. Caddo Parish School Board, 165 La. 200, 115 So. 458 (1928), there was an agreement to complete and deliver the construction of a new school by a stipulated date. The contract provided for a $150.00 a day penalty for every day that the contractor was late in delivering the building. This case has absolutely no applicability to the issues involved in the instant case since the principal object of the contract was to complete the school by a particular date. It is interesting to note, however, that the Court refused to award a penalty past the time that the building was substantially completed, because there was only `a trifling amount of work left to be done'.
"In Pembroke vs. Gulf Oil Corporation, 454 Fed. 606 (5th Cir. 1971), a right-of-way agreement provided that if Gulf violated the agreement and failed to correct the violation within sixty (60) days of written notice, the right-of-way agreement would terminate and that Gulf was required to remove its pipelines within ninety (90) days of written notice so requesting. Gulf violated the agreement, received written notice of violation, failed to correct the violation, received written notice to remove the pipeline and refused to remove the line. The contract provided that if Gulf failed to remove the pipeline in ninety (90) days, it would pay a stipulated per diem penalty. It is clear that the principal obligation contained in the contract was the removal of the pipeline, an act which could be definitely ascertained."
*470 In addition to the foregoing statement, which we have adopted, appellant urges alternatively that the work had been substantially completed. Appellant argues therefore, that if the $200.00 penalty payment were to be construed as applicable to non-completion of the work, substantial completion would render the provision inoperative. Appellant's brief contains the following argument:
"Substantial performance is all that is required for a construction contract. It is well established that under Louisiana law delay penalties are due only for the period of time from the date that the job was to be completed until the date of substantial completion. The owner's right to collect delay damages or demurrage ends upon substantial completion. Elite Homes Inc. vs. Herrmann; 242 So.2d 614 (La.App. 4th Cir. 1970). Small and unimportant portions of the work remaining undone will not justify the owners in refusing to accept the work or entitle them to delay damages. See Loeb vs. Neilson, 128 So.2d 447 (La.App. 4th Cir. 1961)."
In fact, the substantial completion rule is not strictly applicable here, and it is not applicable for the same reason that the penalty was held not applicable in the first place. That reason is that we are not confronted with a contract in which Colonial was obligated to construct something for plaintiffs within a certain time or pay per diem damages until construction was completed. Appellants' obligation was to get off the right-of-way and return it to the Klumpps within sixty days.
For the foregoing reasons we reverse and set aside so much of the trial court's judgment as awarded the per diem penalty of $200.00 per day. This payment was required under the judgment of the trial court ordering defendants to make this payment "until the defendant [Colonial] completes the pipeline work upon plaintiff's property." Appellant urged as error that this provision of the trial court judgment failed to constitute a definitive judgment in that the amount of the recovery remains to be determined by a future contingency. Therefore, appellant urged, that the form of the judgment is fatally defective and is consequently null and void. Inasmuch as we reverse and set aside this aspect of the judgment, we pretermit any discussion of this allegation of error.

II. DAMAGES TO LAND WITHIN THE RIGHT-OF-WAY
Several of plaintiffs' complaints and claims for damages relate to the condition of the land within the right-of-way as it was left when the contractor, FB&D, departed from the premises. Some of these claims, separately asserted and separately treated in plaintiff-appellees' brief, actually merge. They include the claim that appellant and its contractor failed to conduct satisfactory cleanup operations and failed to level and return the land to its original condition as near as practical promptly after construction. In particular, they relate to the alleged failure to use the so-called "double ditching" method in digging the trench within which the pipe was laid and in leaving high spots and low spots within the right-of-way. These high and low areas are sometimes referred to in the testimony as holes and knolls. The alleged failure to use the double ditching method resulted, according to the plaintiffs' theory, in an excessive mixture of clay or subsoil with the top soil so as to affect the fertility and workability of the top soil for agricultural purposes. Plaintiffs also claim that the right-of-way was left strewn with debris of various kinds including 4×6 wood timbers approximately six feet long, wire, welding rods, pipe, reinforcing metal, and other such items.
A major item complained of in connection with the condition in which the right-of-way was left was the alleged violation of paragraph 7 of the servitude agreement. At the Mamou Canal and Louisiana Highway 97 it was necessary to conduct boring operations in order to run the 40-inch pipeline in casing underneath the canal and road. In anticipation that this operation would result in excess spoil to be disposed of, the contract provided in paragraph 7:

*471 "Any dirt removed from the subsurface as a result of boring operations under canal rights of ways, shall be hauled to a low place on Grantor's property, not to exceed one-quarter (¼) mile from the ditch line.
With respect to the factual issues raised by plaintiffs' complaints the evidence is clearly in plaintiffs' favor on at least one point. The evidence establishes that Colonial and FB&D failed to conduct a satisfactory cleanup and failed to level and return the land to its original condition as near as practical promptly after completion of construction. Paragraph 6 of the contract provides for return of the land in the condition just described, but that paragraph also provides that "any future sinking of the ground as a result of the construction of the pipeline will be refilled and releveled at Grantee's expense upon demand by Grantor."
Therefore, Colonial must make fair reparation in this respect. In fact the record indicates that Colonial was willing, prior to this law suit, to make payment to the Klumpps of a fair sum necessary to complete the cleanup operation. Although the Klumpps have been damaged, we do not think that Colonial and FB&D have been egregiously at fault or that the damages were exceptional.
In reviewing the record in the case we are led to believe plaintiffs have an additional objective over and above collecting the damages to which they are certainly entitled. This objective appears to be to attempt to impose upon the pipeline industry higher standards for conducting pipelaying operations and to require more stringent standards for the condition in which the right-of-way contracted for shall be returned to the farmer. The evidence reflects the fact that plaintiffs evidently were dissatisfied with pipeline laying activities on their land at prior times (another company had a pipeline on plaintiffs' land north of Colonial's pipeline) and plaintiffs' attorney actively participated in the drafting of the pipeline servitude agreement in question here. Much of the controversy in this litigation involves interpretation of the provisions of the contract. The litigation reflects a basic conflict of interests between two fundamental and important state economic interests-agriculture (particularly rice and soybean culture) and subsurface transmission of energy by pipeline.
The contract obligates Colonial to return the land leveled and cleaned to its original condition as near as practical. Plaintiffs appear to interpret the contract as requiring return of the land with the subsurface in the exact condition it was in before disturbance. We think the contract provisions recognize that land disturbed in pipeline activities cannot be returned to its exact prior condition and that it is virtually impossible to disturb the top soil without some admixture of subsoil resulting. Moreover, plaintiffs' interpretation would leave the determination of when a pipeline company had fulfilled its obligation up to the landowner. As a practical matter, such an interpretation would make it impossible for the pipeline industry to lay pipelines across agricultural lands. In interpreting the servitude contract in this case, we think that we must give consideration to what might be reasonably expected by the parties given the language they employed in confecting the contract.
Defendants Method for Laying the Pipeline
Plaintiffs called on cross examination Mr. Robert Spenser Hoover who was chief inspector for Colonial on the Klumpp project. It was his duty to see that the pipeline was laid and constructed in accordance with Colonial's specifications and to see that FB&D lived up to its contract with Colonial and also to the contract which Colonial had with the landowners. Mr. Hoover testified that during construction of the pipeline the contractor remained within the right-of-way, both the permanent right-of-way and the temporary right-of-way at all times. The new 40-inch line in question was laid 15 feet north of the south right-of-way line and 20 feet south of the 36-inch line which was already in place. The 36-inch line was located 15 feet south of the north right-of-way *472 line. (Tr. 34-36, Vol. 3). Therefore, the location of the two lines was within the 50 foot right-of-way and would appear as is shown in Exhibit 1 made a part of this opinion.
According to Mr. Hoover, in order to comply with the double ditching requirement the top soil from the area to be trenched was first pushed to the sides by means of bulldozers. The top soil removed provided the soil necessary for construction of the low levee at both right-of-way lines in order to keep the right-of-way clear of rice flooding during construction operations. Mr. Hoover testified that the levee at the north side of the right-of-way was two to three feet wide at the bottom and was completely within the right-of-way line. After the top soil was taken off, the spoil consisting of the subsoil or clay from the ditch was placed north of the ditch. The spoil bank measured approximately 24 feet across and was approximately 7 feet high. It extended to within about two feet of the ditch within which the 40-inch pipe was to be laid. This spoil bank of subsoil did not extend to the levee of top soil. (Tr. 57, Vol. 3).
After the ditch had been dug and the pipe had been laid in the ditch, the clay spoil was pulled back into the ditch with a back filler referred to as a "yo-yo". The back filler was positioned on the south side of the ditch and this instrument never went on the north side of the ditch. (Tr. 59, Vol. 3). After this operation was completed the top soil was then spread over the ditch with a dozer blade. (Tr. 60, Vol. 3). The mode of this operation was for the dozer to move up to the levee of top soil and drag it back over the ditch which had been back filled with subsoil. Mr. Hoover testified that the bulldozer stayed on the south side of the north right-of-way line. The mode of operation was simply to drop the dozer blade over the top of the soil bank of top soil and drag it back. (Tr. 60, Vol. 3).
Mr. Hoover testified that prior to the spreading of the top soil any excess clay or subsoil was crowned up over the ditch. Actually according to him the excess was shifted to the low spots. (Tr. 61-62, Vol. 3). Crowning operations are designed to take care of anticipated earth shrinkage to reduce subsequent subsiding and shrinking of the soil where the ditch is located. (Tr. 62-63 and 71, Vol. 3).
Hoover testified that the process of removing the top soil and setting it aside before digging the ditch is referred to as "double ditching". He stated that approximately 80 percent of the tracts in the area were double ditched.
In connection with the boring operations under the Mamou Canal and the highway Hoover stated that some 90 cubic yards of dirt were taken out. This spoil was not hauled away but was put in a low area at the highway. (Tr. 42-44, Vol. 3). There was a "hole" or low spot about 30 feet by 50 feet near the Mamou Canal where such excess spoil from the boring operations was deposited. (Tr. 62, Vol. 3). Hoover explained that the dirt was put in this low area because it was low and appeared to need filling. (Tr. 99, Vol. 3). Hoover appears to have spot checked to determine the condition of the right-of-way after completion of the cleanup operations. However, he did so from the top of the Mamou Canal and from the parish road running through the center of the property. He did not walk the right-of-way. (Tr. 84-85, Vol. 3). Hoover considered the cleanup job a good job. (Tr. 90, Vol. 3). However, he admitted that a proper cleanup job would include reconnecting levees, filling pot holes, removing welding rods, and posts, lumber, and other material. (Tr. 90, Vol. 3).
Testimony of Plaintiffs' Experts
The principal testimony on behalf on the plaintiffs was given by a team of three eminently qualified experts, Dr. James A. Foret, Dr. Charles C. Cain and Dr. Charles Thomas Maher. At the time of trial, Dr. Foret was Dean of Agriculture at the University of Southwestern Louisiana. Educationally he had received a Bachelors degree in Horticulture from the University of Southwestern Louisiana, a Masters degree and a Ph.D degree from Iowa State University. Dr. Foret and Dr. Cain were co-owners *473 of Gulf Coast Agricultural Surveying Service. This concern had operated for approximately 25 years. Their company did consultation work involving soil disturbances, hebacity damage claims and tree damage. Dr. Poret had been previously accepted as an expert to testify in cases in court in agricultural soils and Agronomy. However, he considered Dr. Cain to be the principal team member qualified in the field of soils. Dr. Foret considered himself as a general consultant in soil disturbances, soil residues and crop damages. All three members of this team of experts visited plaintiffs' farm together on two occasions, once in 1977 and once in 1978.
Dr. Foret was the leader of the team of experts and prepared their report, which the other two members approved. Dr. Foret testified to a large extent as a representative of the three members. Dr. Cain and Dr. Maher both testified, but they stated they agreed with the testimony of Dr. Foret and contributed to the report and agreed with it.
Two written reports were submitted by plaintiffs' experts. The first was dated May 12, 1978 (P-19) and the second was dated May 29, 1978 (P-18). The team first visited the plaintiffs' premises on May 31, 1977. Dr. Foret explained in his testimony (Tr. 104, Vol. 3) that on his first visit the eastern half of the plaintiffs' property was already planted in rice and was flooded. For this reason the team was unable to go on that part of the property or to take any elevations. In 1977, plaintiffs' tenant, Felix Klumpp, planted the western half of the land (exclusive of the right-of-way) in soybeans. The western half lies between the public road running north and south through the property and the Mamou Canal on the west. The distance from the road to the canal was approximately one half mile. (Tr. 105, Vol. 3). This western half of the right-of-way was checked by the team of experts in 1977.
The May 12, 1978, report (P-19) is set forth in a footnote below.[5]
At the time of the team experts' visit in 1977, the area within the limits of the right-of-way had not been conditioned for plaintiff, but the area outside of it was planted in soybeans. (Tr. 105, Vol. 3). Dr. Foret felt that the right-of-way was rough and needed additional working prior to planting but felt that there were very few depressions or holes showing along the right-of-way. (Tr. 106, Vol. 3). On a subsequent visit he found this to be different. Although Dr. Foret's first report stated that the preliminary survey revealed the right-of-way visited was free of debris, in his testimony (Tr. 106, Vol. 3) he did state that some debris was evident and consisted of pieces of lumber, welding rods, steel rods, and various pieces of metal.
It is quite clear from Dr. Foret's testimony that he did not consider the damage to *474 plaintiffs' land to be a serious matter. Plaintiffs introduced into evidence a series of photographs of the land to demonstrate the holes and knolls which needed to be leveled and some pictures purporting to demonstrate the debris left on the right-of-way. While the pictures by themselves would lead one to believe that a serious condition had been left, the testimony of Dean Foret considerably lessened their effect. With respect to the debris the most telling testimony was his estimate of $60.00 to cover two man days of work to remove the debris. (Tr. 140, Vol. 3). His testimony concerning this matter (Tr. 118, Vol. 3) was as follows:
"Q Was there a lot or was there just a little bit?
A There were pieces here and there just so often. No there was not a lot of debris.
Q But it would-would it be feasible to plow with ordinary agriculture plows?
A If it were my land I would certainly have a man walk it and pick up this debris prior to moving equipment on to it."
With reference to the law areas and depressions Dr. Foret testified (Tr. 110, Vol. 3) that it was his opinion that the holes and depressions had been caused by settling over and around the pipe or perhaps the settling of some holes that had been dug during the pipeline operation. He indicated that leveling was essential to growing soybeans and rice. (Tr. 110-111, Vol. 3). Failure to do so would result in crop failure. However, Dr. Foret testified that the holes or depressions were not of sufficient acreage to significantly influence the yield of rice. Nevertheless, Dr. Foret did not consider the job to be a turn key job (Tr. 119, Vol. 3), and did not consider the job to be complete. (Tr. 120, Vol. 3). With reference to the western half of the crop right-of-way which was not planted in soybeans in 1977, Dr. Foret testified (Tr. 126, Vol. 3) that in order to obtain a turn key job some disking and harrowing would be required. Some 4.8 acres were in need of this conditioning at an estimated cost of $100.00 per acre. This is reflected in his May 12, 1978, report. The total amount, therefore, would be $480.00 in order to prepare the land for planting.
For the purpose of filling and leveling, it was the opinion of Dr. Foret, and it should be recalled that this was agreed to by the other two expert's, that a total of $2,620.00 involving four days of dozer work and land leveling would be required in order to make the plaintiffs whole. This is reflected in the May 29, 1978, report (P-18) which is indicated below.[6] The testimony and the *475 report break the estimate down for the two areas of the right-of-way, that is, the eastern and western halves. However, in total some 10.9 acres of land were estimated as requiring leveling. See Dr. Foret's testimony beginning at Tr. 136 and running through Tr. 142. In summary, each half of the right-of-way would require two days of dozer work at $35.00 per hour ($560.00 for each half or a total of $1,120.00). After this work was accomplished additional leveling for each half (5.45 acres for each half) would require two days of work at $45.00 an hour. Therefore, each side would require an expenditure of $720.00 or a total of $1,400.00. Dr. Foret agreed with counsel that the total would be $2,620.00 (Tr. 144, Vol. 3). Addition of $1,120.00 and $1,440.00 would result in $2,560.00, therefore, we assume that the figure of $2,620.00 includes the sum of $60.00 for trash removal listed on P-18 and which evidently refers to the debris left on the right-of-way.[7]
The disposal of the spoil produced by the boring operations at the Mamou Canal and the highway are governed by paragraph 7 of the servitude contract which reads:
"Any dirt removed from the subsurface as a result of boring operations under canal rights of ways, shall be hauled to a low place on Grantor's property, not to exceed one-quarter (¼) mile from the ditch line.
Plaintiffs contend this was not done, but as we appreciate the uncontroverted testimony of Mr. Hoover and Mr. Mullen, the excess dirt resulting from boring was put in a low place near or next to the canal. It is not clear, but plaintiffs appear to be complaining that they were not given the privilege of selecting the exact location for deposit of this particular spoil. However, that may be, the privilege of selecting the deposit site does not appear to be granted to plaintiffs by paragraph 7. We feel that the option was left with Colonial and its contractor limited by the proviso that the low place actually selected should not be further than one-quarter of a mile from the ditch line.
In connection with the deposit of this particular dirt plaintiffs complain that the area where it was spread was left higher by some nine inches than the remainder of the land. (Tr. 58-60, Vol. 4). The trial court seems not to have made any specific finding of fact on this point and the evidence is not too strong in this regard. The evidence does establish that tolerable differences in elevation of both soybean and rice fields is very critical in the successful growing of these crops, and rice fields must be level so as not to exceed two inches of difference. Nevertheless, the point is somewhat moot because we assume that the remedy for undue high elevation of the boring spoil would consist of the bulldozer grading or land leveling included in the estimate of damages supplied by plaintiffs' team of experts through Dean Foret. P-19, Report of May 29, 1978. That estimate, as previously noted, includes $560.00 for two days of bulldozer work and $720.00 for two days of land leveling of the right-of-way for each half of the land. The west half of the right-of-way was approximately one-half mile in length. (Tr. 105, Vol. 3).
As we appreciate the testimony in this case there is a technical difference between the dozer work and the land leveling work referred to. The dozer work would be required to fill the major holes and depressions and to level off significant knolls or mounds of earth. Leveling on the other hand, is a frequently required process, particularly in rice culture, to maintain the *476 fields within the tolerable levels of differences in elevations. Therefore, one of these processes should result in leveling the excess spoil produced from boring.
In the event that we should be incorrect in our assumptions, we nevertheless consider the point moot because, if we are in error, no specific damages were proven in regard to the leaving of such area of higher elevation. It also strikes us that if the area was low to begin with, which is not controverted, then it would not have been land susceptible of cultivation prior to the laying of the pipeline. If that is so, then no damages were sustained by plaintiffs. The area used for the spoil from boring was not previously available for cultivation as proved by their own evidence as to the narrow tolerances in elevation differences.
Double Ditching Controversy
Considerable testimony was taken concerning whether defendants did or did not employ the double ditching method required by paragraph 15 of the servitude agreement. From the testimony of Colonial's chief inspector, Mr. Hoover, and the testimony of FB&D's manager of its pipeline division, Mr. Herbert D. Mullen, we are inclined to believe this method was followed. The chief controversy seems to be over whether or not it was proper for the defendants to employ a bulldozer in the manner described by Mr. Hoover and later by Mr. Mullen. The plaintiffs were of the opinion that paragraph 15 specifying the use of the double ditching method required the use of two different ditching machines, one to take off the top soil and the second to actually dig the ditch. Mr. Mullen testified that there are several methods and that in actuality the machine used by them could have been used in the manner contended for by plaintiffs, and that it is not necessary to use two separate machines. (Tr. 198-199, Vol. 4). Mr. Mullen also explained that the reason the ditching machine was not used in this instance was because such a machine requires dry conditions for use and the conditions under which the bulldozers were used were wet. (Tr. 197-198, Vol. 4).
We are inclined to believe that in the controversy over this particular point plaintiffs have not carried the burden of proof to show that the double ditching method was not used. The trial court did not award any particular damages for failure to use this method nor make any finding in regard to it. Dr. Foret testified that boring samples were taken from the right-of-way and it was found that the top soil contained a pronounced mixture of clay. Nevertheless, we are inclined to believe this is probably standard as a result of any pipeline laying operation and would result even under the most expert execution of the double ditching method. Dr. Foret approved of the technique described by Mr. Hoover and stated that he would anticipate that double ditching would be done in that manner. (Tr. 109, Vol. 3).
As a matter of fact it appears that any mixing of clay with top soil was taken into consideration in the estimate of a crop loss in future years given by Dr. Foret and awarded by the trial judge. Testimony concerning the reduction of crop yields following pipeline laying operations was given by Dr. Foret in response to questions on direct examination by plaintiffs' counsel on pages 108 and 109 of volume 3 of the transcript.
"Q Explain that why, when you have seen double ditching what was the condition of the soil?
A Generally, when double ditching is done the top soil is layed on top as previously explained and there is enough differential in color that it can be distinguished and in texture and the other characteristics in topsoil.
Q The evidence that you found was that it was mixed?
A A mixed soil was on the surface.
Q How would that affect the use in the future for planting rice or soy beans as to the yield and so forth.
A From our experience with rights of way and soil disturbance on rights of *477 way, depending on the crop, depending on the soil, but generally speaking in the rice area, we can anticipate about a 20% reduction in yield. In the case of rice there is some and in the case of any crop there is some nutritional imbalance that could be brought about or some disturbance of drainage in the case of rice of deep and in the case of soy beans blockage or just impairments in general.
Q What in your opinion is a proper method of double ditching?
A If I may refer to a previous witness I see nothing wrong with the technique that he referred to being used. He explained it certainly as I would anticipate it could be done.
Q Provided it was done properly?
A Right.
Q And you found that there was mixture so apparently it was not done properly.
A I can't say[,] I'm referring on the cite (sic) and that was a mixture of soil, topsoil and subsoil.
Q Would you give to the Court the benefit of your estimation of the degree of mixture, was it a lot or just barely.
A Yes, it was pronounced on the entire right of way.
Q What would be required to correct that? Do you know?
A Depending on the soil and the crop being grown. We found that in general that after a second or third crop that the yield will return to normal, but this depends on the crop being rotated and the method that that soil is handled."
Pertinent to this point also is testimony given by Dr. Foret on cross examination on pages 142 through 144 of volume 3 of the transcript.

"CROSS EXAMINATION
MR. PARKER:
Q Mr. Foret I take it that in your experience after a pipeline is constructed you frequently experience a crop reduction in the area of the right of way, yield?
A Yes, sir.
Q And in your experience I also take it that after about the third crop year it returns to basically normal production?
A On the average, in some instances I have seen an improvement in crop yield the first year, it just depends on soil types and location.
Q Would it also depend on the various operations of the farmer, that the farmer employs in restoring the right of way?
A Yes, sir.
Q And working the fields?
A Yes, sir.
Q You have seen a good many pipeline construction jobs through agricultural fields have you not?
A Yes, sir.
Q You don't expect that pipeline contractor is going to leave the field in condition for the farmer to go out and plant it do you?
A Some tell me that this is what they signed an agreement to do, I don't know.
Q Have you ever seen such a situation where the pipeline contractor left the field in the condition to where the farmer just had to go out and plant, and did not have to do any harrowing, didn't have to do any discing or any of the normal operations that the does.
A No sir.
Q You have never seen one in your experience have you?
A No sir.
Q That is one of the reasons that you said that this is one of the better pipeline cleanup jobs that you have seen, is that not right?
A Yes.
*478 Q You said that this is one of the better pipeline construction cleanup jobs that you have ever seen?
A Yes, sir.
Q And you will stand by that statement?
A Yes but I wouldn't say it was an `A' job, if I had to give you a grade on it I would say you had a `B'.
Q `B' is passing is it not?
A Yes it is.
Q In looking over the numbers on your report, as I read you felt-you and your colleagues, let me ask you that by the way, do your colleagues both subscribe to the report?
A Yes sir.
Q You and your two colleagues concluded that for the sum of $1120.00 in bulldozer costs and fourteen hundred and forty in land leveling and sixty dollars in cleanup costs, a total of $2620.00, this land would be in complete condition to plant.
A We felt that this would have brought it to a condition yes, that the farmer could have gone in to plant.
MR. PARKER:
I think that is all the questions I have, Your Honor."
Before leaving this point we will briefly refer to the testimony of Dr. Charles C. Cain on this point. (Tr. 147-171, Vol. 3). Dr. Cain was a retired professor of Agronomy and former head of the Department of General Agriculture at the University of Southwestern Louisiana. He serviced as a professor of Agronomy at USL for a period of 29 years. He had a Bachelor of Science degree in Agronomy and a minor in Botany from Louisiana State University, and a Master of Science degree in Soil Science with a minor in Chemistry from Iowa State University and a Ph.D. degree with a major in soil and a minor in Plant Pathology from Iowa State University.
Dr. Cain was asked (Tr. 153, Vol. 3):
"Did you reach a conclusion as to whether or not whoever had worked thereon had separated the top soil and clay?"
His answer was (Tr. 153 & 154, Vol. 3):
"I have never seen a job where, they separate the top soil from the subsoil. I know there are some cases where it is supposedly done, but I have never seen them to it. Whether this was done or not, at least, it was somewhat mixed when it was put back in place. I don't know whether it was separated or not in the initial operation."
On cross examination he was asked (Tr. 162, Vol. 3) whether or not the term "double ditching" was scientific terminology as used by soil people and his answer was no. He stated that he had heard the term used to some extent in connection with pipelines but had never heard it in connection with construction of pipelines through rice lands. He stated "it is fairly new in this part of the country . . . that term ... is used quite a bit in the mid-west for double ditching and through the agricultural area, it is rather new terminology for this part of the country."
Dr. Cain testified that a farmer should work on the land after a pipeline has been laid in order that the land may be leveled and smoothed out and that it should be harrowed and disced as well as fertilized. (Tr. 163-165, Vol. 3). He also testified that when a farmer works the land it helps eliminate the subsidence problem. (Tr. 165, Vol. 3). He testified further to the effect (Tr. 165-166, Vol. 3) he has never seen a situation where some subsoil could not be found on top after a disturbance of the soil of pipeline laying. His testimony as recorded on pages 165 through 168 of volume 3 of the transcript is as follows:
"Q And harrowed and disced?
A Yes.
Q Fertilized and all that, does that help to restore the fertility when you do that?
A Yes, once it is smoothed out to where you can get your equipment working on it, you are that much better off.
Q Now you-Have you had experience with seeing the pipeline trenches subside after a period of time?
*479 A Yes, sir.
Q Is that unusual?
A No sir.
Q Does the farmer when he works back and forth does he help eliminate that subsiding?
A Yes.
Q Setting that soil back in place
A He would make a real effort to try to get the trench built up again.
Q I am somewhat unclear Dr. Cain about your testimony relative to this question of the bottom soil on the top and the top soil on the bottom if I can use that-Did I understand you to say that you have never personally seen a successful attempt to keep the topsoil separate during the pipeline crossing.
A I have never seen it where you couldn't find some of the subsoil on the top.
Q Even where an attempt was made-Let me ask you this. Did you hear the testimony of the Colonial witness about how they constructed it?
A Yes.
Q On the Klumpp property?
A Yes.
Q About coming in there and laying the top soil off to one side and laying it off on the other side?
A Yes, sir.
Q And then I take it that even following that construction practice you still in your experience get some mixing and blending as you say of this top and bottom soil?
A I don't believe you can separate it out well enough and rebuild it well enough to put it back together in good enough order that you can't find some subsoil in the surface.
Q And in the case of the Klumpp property then you were not surprised at what you found?
A No I was not surprised, no sir.
Q Dr. Cain, you soil experts have a terminology that you-can you enlighten us on the various depths of the soil? Like what is that?
A If we are talking about soil profile with different orisons (sic) in it.
Q What is a top orison (sic) if that is a proper terminology, what does that mean?
A We start with `A',
Q What is it, is that the topsoil?
A Right.
Q What, this is the Crowley clay
A Crowley silt loam
Q You will have to bear with me. Is that a relatively common soil?
A Very common in this part of the country.
Q And by this part of the country, what do you mean?
A Southwest Louisiana.
Q How about East Texas?
A I don't believe they have any but they may have some around Beaumont there, I don't think they do.
Q Arkansas?
A I am not certain whether they have some in the Eastern part of Arkansas in the rice area."
Dr. Thomas F. Maher also testified as a member of the team, corroborating the other two experts and verifying that Dean Foret's report represented their collective views. Dr. Maher was head of the Agricultural Engineering Department at the University of Southwestern Louisiana and had held the position for some fifteen years. He had earned a Bachelor of Science degree in Agricultural Engineering from Oklahoma State, a Masters degree from Texas A & M and a PhD. degree from Oklahoma State. He was a licensed Agricultural Engineer in the State of Louisiana. Dr. Maher ran the levels for the three member team of experts. Levels on the rice land were not run until 1978. As to this, Dr. Maher admits that the elevations found were those of the farmer rather than FB&D. (Tr. 222, Vol. 3). We assume, however, that some low places resulted from agricultural equipment *480 bogging or becoming stuck in low places which were either left by the contractor or resulted from subsidence around the 40-inch pipe laid by FB&D.
Finally, we are led to believe from the tenor of all of the testimony that some damage to agricultural land through the laying of pipelines is normal and expectable but that the land will return substantially to its former fertility and productivity if properly managed by the farmer. (Tr. 142, Vol. 3). According to Dr. Cain this damage cannot be eliminated even with double ditching. The servitude contract employed words of agreement whereby Colonial agreed "to level and return the land to its original condition as near as practical promptly after construction." (Emphasis supplied) It would seem unreasonable for plaintiffs to now contend that because Colonial was obligated to use the double ditching method, appellant was obligated to return the right-of-way to its pristine condition completely free of subsoil and prepared ready for planting. The evidence reflects the fact that two previous pipelines had been laid on plaintiffs' property. The Klumpps testified that because of their previous experience with pipeline companies (apparently not to their satisfaction) they gave special care in the drafting of the servitude agreement with Colonial to make certain that their land would not be damaged. We are unable to read the contract as providing that the land be returned to them in the exact condition it was in when defendants began their operations.
Quantum For Damages To Land Within The Right-Of-Way
The trial court found Colonial and FB&D to be liable for crop losses in the amount of $2,018.80 and $80.00 in time loss. These two awards are evidently taken from the team report submitted by Dr. Foret and consist of the following items:

Loss of 1977 soybean crop on (5.45
acres), 40 bu. at $7. $1526.00
20% yield reduction1978 soybean
crop on 2970' x 40' (2.73 acres). 152.60
1977 rice crop loss estimated 20% on
rice2.43 acres (30 bbls at $14.) 204.12
1978 soybean crop loss estimated 20%
on 2.43 acres (40 bu at $7.) 136.08
 ________
 TOTAL $2018.80

The team estimate shows $80.00 for "time loss on equipment stuck in low areas in maneuvering around low spots ½ day at $20./hr."
It may very well be that it was contemplated that such damages were to be compensated for by liquidated damages paid in advance and upon the signing of the contract. Mr. Raymond Klumpp acknowledged receipt of $25,504.50 at the signing of the contract. (Tr. 117, Vol. 4) Mr. Klumpp also acknowledged that of this sum $4,252.77 was paid as crop damages, but he maintained that this was payment for the 1976 crop only. (Tr. 118, Vol. 4). Since there is no evidence to the contrary, we conclude, as the trial court apparently did that Mr. Klumpp is correct. Moreover, we note that the servitude contract recites that it is entered into for and in consideration of the sum of $100.00 "and other valuable consideration". Consequently, we have no evidence before us that liquidated damages for crop losses for years beyond 1976 were paid at the signing of the contract.
We have some doubts as to the item of $1,526.00 as loss for the 1977 soybean crop on 5.45 acres. From the conferences and negotiations between the Klumpps and representatives of Colonial and FB&D which followed the leaving of the construction site, it would appear to us that it should have been clear that these parties had refused to return to make any correction of any deficiencies complained of. Plaintiffs' experts testified that the working of the land helped in the matter of avoiding subsidence around the pipe and advanced the land toward recovery of its fertility. The explanation given by the Klumpps as to why one-half of the right-of-way was not planted in soybeans in 1977 is not particularly impressive. Nevertheless, the trial court saw fit to grant the damages for loss of the entire soybean crop on one-half of the right-of-way for the year 1977, and we do not feel that the state *481 of the evidence indicates that it was clearly wrong in making this award. Consequently, we will allow it to stand. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1979) and Matte v. Guillory, 370 So.2d 1299 (La.App. 3rd Cir. 1979), writ denied, 374 So.2d 661 (La. 1979).
We likewise find no manifest error in allowing the sum of $80.00 for down time. Therefore, we will affirm the trial court's award of these damages.

III. DAMAGES TO LAND OUTSIDE THE RIGHT-OF-WAY
In their original petition the plaintiffs alleged that the defendant exceeded the right-of-way and temporary work space granted to them and they demanded the sum of $20,000.00 in damages under paragraph 18 of the servitude agreement.
Paragraph 18 reads as follows:
"In the event Grantee or any of its contractors shall exceed and go over the right-of-way and temporary work space granted herein, Grantee shall pay a penalty of $35.00 per rod for each lenial rod used on the right-of-way which does not exceed five (5) feet in width, thereafter the penalty shall be doubled for each additional five (5) feet in width used."
The trial court made a specific finding on this point reading:
"Further, the court finds by a preponderance of the evidence that Colonial is liable to plaintiff for contractual damages in the amount of FIFTY-ONE THOUSAND, FIVE HUNDRED FORTY AND no/100 ($51,540.00) DOLLARS. As a result of its contract exceeding the allowed work space during the construction of said pipeline, as provided for in paragraph 18 of said agreement."
After a careful review of the evidence and giving full weight to all testimony we have concluded that the trial court was clearly wrong in this finding. Therefore with respect to the award for damages outside the right-of-way boundaries and the temporary work space, we reverse.
The general work space of an additional 70 feet was located entirely south of the existing right-of-way. No temporary working space was given north of the right-of-way except possibly for some particular points as provided in the contract. The evidence established that the work of refilling the trench after the 40-inch line had been laid was done by equipment operating entirely from the south side of the trench. The only time that the north right-of-way line was approached was in the operation of moving the top soil to the north line in the course of the double ditching operation and for the additional purpose of creating a levee along that right-of-way line. We are convinced that none of the spoil from digging the major trench was placed near this line. After the trench had been filled with the subsoil, the levee of top soil at the north right-of-way line was spread by the use of bulldozers which dropped their blades over the levee and pulled it back over the excavated area. Only by extending the blades beyond the north line could any damage to the area north of the right-of-way have resulted.
Evidently, the Klumpps never observed any actual trespass by FB&D north of the north right-of-way line. (Tr. 82 & 83, Vol. 4). On the other hand, the plaintiffs testified that they employed an elaborate scheme by which they concluded that the contractor had in fact exceeded the limits allowed. Over strenuous objection the Klumpps were allowed to describe the procedure by which they determined this. The objections were leveled at the validity of plaintiffs' methods and their qualification to perform their procedures. The trial court admitted the testimony of the Klumpps, preferring to let the objection go to the weight rather than the admissibility.
Over two years after the pipeline operation had been finished, that is in December of 1978, the Klumpps performed the operation which they contend demonstrated that FB&D did exceed the right-of-way on the north side. This operation began by locating *482 the 40-inch pipeline, by the Klumpps through the means of probes. Then at very short intervals a line was measured northward from the 40-inch line. The Klumpps purported to be able to determine from an examination of the soil two years after the operation whether or not it had been disturbed. This was principally by finding clay mixed with the top soil and by certain weed growth.
We do not believe this highly unsophisticated system of divination meets the standard of proof necessary to establish that the employees or the equipment of FB&D actually trespassed on plaintiffs' land north of the north right-of-way line. We consider it to be highly speculative and conjectural. While circumstantial evidence is sufficient to constitute a preponderance of evidence, taking all the evidence as a whole, it must establish that the fact to be proved is more probable than not. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (La. 1971). We feel that plaintiffs have failed to meet the Jordan test. It should be pointed out that the 40-inch line in question in this suit is not the first line which had been laid on plaintiffs' land. In addition to the 36-inch line laid by Colonial within its 50 foot right-of-way, there was a Texaco pipeline immediately north of Colonial's right-of-way. Assuming that the presence of clay and peculiar weed growth indicate anything, it does not necessarily establish that FB&D caused the disturbance and that it thus exceeded the right-of-way. Moreover, no issue appears to have been made as to the trespass beyond the north right-of-way line at the time of the alleged trespass or at the time the initial demands were made on Colonial and FB&D.

IV. ANSWER TO THE APPEAL AND ENLARGEMENT OF THE PLEADINGS
Our disposition of the trespass issue renders moot two issues in this appeal. In plaintiffs' petition the sum of $20,000.00 was demanded as damages for the alleged trespass of their property beyond the north right-of-way line. The trial court awarded $51,540.00. In answer to the appeal the plaintiffs have asked that damages for trespass be increased to $183,770.00. Plaintiffs contend that the pleadings were enlarged during trial permitting the trial court to award a sum greater than the $20,000.00 originally demanded and justifying a greater award than that made by the trial court. As we deny this item of damage, the issues of enlargement and amount of damages need not be considered.

V. ATTORNEY'S FEES
The trial court awarded attorney's fees in the amount of $35,000.00 under paragraph 19 of the servitude agreement.
"In the event Grantor, after prior 60-day notice in writing, should have to resort to legal process for the enforcement of any of the terms of this agreement, including damages, the Grantee shall be obligated to pay expenses incurred by Grantor, including court costs and attorney fees."
From the testimony of Felix Klumpp who actually farmed the land (Tr. 2, Vol. 4) we may deduce that in the Klumpps' conversations with representatives of FB&D and Colonial that Colonial actually offered to pay for the damages resulting from the holes and knolls left in the right-of-way and for the necessary work to clear the right-of-way debris. (Tr. 78, Vol. 4). This is denied by Raymond Klumpp. (Tr. 121, Vol. 4). On the other hand he explains his unwillingness to accept money as damages for the purpose of hiring a bulldozer to do the work by saying that "he would have refused to do so because he was not supposed to go and dig on the pipeline."
Considering these contentions and the complexity of issues raised in this law suit, as indicated by all of the foregoing, we conclude that it was necessary for plaintiffs *483 to resort to legal process. Therefore the trial court did not commit error in awarding attorney's fees. Nevertheless in view of our action in reversing the trial court on all but a minor amount of the total award, we feel that the amount of the attorney's fees should be re-examined. Considering the amount which we award and the evident amount of work done by counsel, we conclude that an award of $5,000.00 as attorney's fees would be reasonable.

DECREE
For the reasons given above, we reverse the judgment of the trial court except insofar as it awarded $2,400.00 for bulldozer work to be done and releveling of the property, the award of $2,018.00 for crop loss, the award of $80.00 for down time and the award of expert witness fees.
We recast the judgment so as to read as follows:
IT IS NOW THEREFORE ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of plaintiff Raymond Klumpp, individually and as agent and attorney in fact for Alphan Klumpp, Felix Klumpp, Jean Wilson Klumpp, Marie Wedna Klumpp, Evana Marie Klumpp, Edna Klumpp, Barbara Jean Klumpp, Terry G. Fontenot, Verly Julia Klumpp, Mary Jane Klumpp, Human James Klumpp, and Gary Glenn Klumpp and against the defendant, Colonial Pipeline Company in the amount of $2,400.00 for filling holes and reshaping knolls and releveling of the property;
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of Raymond Klumpp, individually and against the defendant, Colonial Pipeline Company in the amount of $2,018.00 for crop loss and $80.00 for down time, subject to any agreement entered into with defendant, Ford, Bacon, and Davis Construction Company relative to the liability of the latter for such damages in tort in favor of plaintiff, Raymond Klumpp;[8]
IT IS ALSO FURTHER ORDERED, ADJUDGED, AND DECREED that all damages awarded herein are awarded together with legal interest from date of judicial demand until paid and that all costs of these proceedings be paid by defendant, Colonial Pipeline Company;
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of plaintiff, Raymond Klumpp, and the principals he represents and against the defendant, Colonial Pipeline Company for attorney's fees in the amount of $5,000.00;
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the expert witness fees for Doctors James A. Foret, Charles C. Cain and Charles Thomas Maher be and they are hereby set at $375.00 each, such fees to be taxed as additional court costs to be paid by the defendants, Colonial Pipeline Company and Ford, Bacon, and Davis Construction Company.
All costs of this appeal are to be assessed one-half to plaintiffs-appellees and one-half to defendant-appellant Colonial Pipeline Company.
AFFIRMED IN PART, REVERSED IN PART AND AMENDED.
*484 
NOTES
[1] The land over which the servitude lies is described in the petition as being situated in Acadia Parish, Louisiana and consisting of:

"The S ½ of the NW ¼ and the NE ¼. of Section 34, and in the SE ¼ of the NE ¼ of Section 33, Township 7 South, Range 2 West."
[2] Paragraph I of plaintiffs' petition states:

"Raymond Klumpp is bringing suit, individually and as the agent and attorney in fact for Alphan Klumpp, Felix Klumpp, Jean Wilson Klumpp, Marie Wedna Klumpp, Evana Marie Klumpp, Edna Klumpp, Barbara Jean Klumpp, Terry G. Fontenot, Verly Julia Klumpp, Mary Jane Klumpp, Human James Klumpp, and Gary Glenn Klumpp, all of whom are the heirs of the Estate of Armentine Aguillard Klumpp, who have been put into possession of all property belonging to said estate, as per power of attorney dated February 2, 1977, and recorded as Act No. 435839, in Conveyance Book B-35, at Page 502, Acadia Parish, Louisiana records."
[3] The denial was on the ground that this court will not interfere with orderly proceedings in the trial court, in the absence of a showing of irreparable injury, and that Colonial had a remedy by appeal in the event of an adverse judgment on the merits. (Tr. 64)
[4] LSA-C.C.P. art. 462 provides as follows:

"A plaintiff may cumulate against the same defendant two or more actions even though based on different grounds, if:
(1) Each of the actions cumulated is within the jurisdiction of the court and is brought in the proper venue; and
(2) All of the actions cumulated are mutually consistent and employ the same form of procedure.
Except as otherwise provided in Article 3657, inconsistent or mutually exclusive actions may be cumulated in the same judicial demand if pleaded in the alternative."
[5] Plaintiffs' Exhibit P-19 reads as follows:
 May 12, 1978

Mr. J. Nilas Young Attorney at Law P. O. Box 985 Eunice, LA 70535
 RE: R/W 202:117 Estate of Armentine
 A. Klumpp Acadia Parish, LA
Dear Mr. Young:
On May 31, 1977, accompanied by Dr. Charles Cain and Dr. T. F. Maher, I visited the above captioned property to investigate the site of pipeline operations to determine the extent of agricultural damages incurred.
We visited only that portion of the right-of-way that crossed Mr. Klumpp's soybean acreage. We were unable to trespass on the rice acreage because of the young developing crop and flooded fields. We did not investigate this portion of the Klumpp estate property because we were to be notified of harvest dates and a 1975 aerial photo of all affected acreage.
Our preliminary survey revealed that the right-of-way visited was free of debris. The right-of-way was not planted, but required disking, harrowing and land levelling prior to planting of the next crop. Approximately 4.8 acres were in need of this conditioning at an estimated cost of $100. per acre.
We found no evidence of double trenching. The right-of-way and trench revealed a general blending of the soil.
Should further information be required, please feel free to call or write.
 Respectfully submitted,
 J. A. Foret, Consultant
 256 Edgewood Drive
 Lafayette, LA 70503
vc encl.
[6] Plaintiffs' Exhibit P-18 reads as follows:
 May 29, 1978

Mr. J. Nilas Young Attorney at Law P.O. Box 985 Eunice, LA 70535
 RE: R/W 202:117 Estate of Armentine A.
Klumpp
 Acadia Parish. LA. 
Dear Mr. Young:
On May 19, 1978, accompanied by Dr. Charles Cain and Dr. T. F. Maher, I visited the above captioned property to investigate the site of pipeline operations performed in 1977 and to determine the extent of agricultural damages.
We made observations on the entire right of way on this property.
Additional soil preparations, leveling, etc. will be required over most of the right of way.
Specifically, our observations and estimates of damages incurred are as follows:
On the NW ¼ Sec. 34 T 7 S, R 2 W on right of way:

1. Several low areas and small
mounds to be graded after harvest,
fall, 1978.
Bulldozer2 days at $35./hr $ 560.00
2. Land level on right of way (5.45
acres), 2 days at $45./hr. $ 720.00
3. Loss of 1977 soybean crop on
(5.45 acres), 40 bu. at $7. $1526.00
4. One man day for trash removal. 30.00
5. 20% yield reduction1978 soybean
crop on 2970' x 40' (2.73 acres). 1 52.60
On the NE ¼ Sec. 34 T 7 S, R 2 W
on right of way:
1. Several low areas and mounds to
be graded after harvest, fall, 1978.
Bulldozer2 days at $35./hr. $ 560.00
2. Landlevelling on right of way
(5.45 acres), 2 days at $45./hr $ 720.00
3. (a) 1977 rice crop loss estimated
20% on rice2.43 acres (30bbls at
$14.) $ 204.12
(b) 1978 soybean crop loss estimated
20% on 2.43 acres (40 bu at $7.) $ 136.08
4. One man day for trash removal $ 30.00
5. Time loss from equipment stuck
in low areas and maneuvering around
low spots ½ day at $20./hr. $ 80.00

Should further information be required, please feel free to call or write.
 Respectfully submitted.
 J. A. Foret, Consultant
 256 Edgewood Drive
 Lafayette, LA 70502

[7] The trial court awarded only $2,400.00 which would appear to be in conformity with the limitation contained in paragraph 6 of the servitude agreement.
[8] The judgment rendered by the trial court was not a solidary judgment against Colonial Pipeline Company and Ford, Bacon, and Davis Construction Company. The only part of the judgment for which FB&D was cast was for the crop loss and down time and the costs of court. FB&D did not appeal but the language of this paragraph conforms to the language of the trial court's judgment. We assume that Raymond Klumpp as the tenant of the other plaintiffs is the only plaintiff entitled to the award for crop damage.